UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Joseph H. Rodriguez |
| | : | |
| | : | 08-0239 (JHR) |
| v. | : | |
| | : | **Opinion & Order** |
| | : | |
| FRANKIE CORREA | : | |
| | : | |

    This matter comes before the Court on Defendant Frankie Correa's motion to suppress evidence [Dock. Entry 11] under the Fourth Amendment. Defendant contends that the firearm recovered on his person is fruit of an illegal seizure. The Government opposes. For the reasons expressed below, Defendant's motion is denied.

**I. Factual and Procedural Background**

    In December of 2007, members of the Essex County Fugitive Task Force were vigorously searching for Jose Espinosa, an escaped inmate from Union County Jail. (Hr'g Tr. 46:6-22, Oct. 15, 2008.) The Task Force included various members of the F.B.I., U.S. Marshal's Office, Essex County Sheriff's Office, and Union County Sheriff's Office. (Tr. 14:3-6.) On December 19, 2007, members of the Task Force received information that Luis Luna and James Romero were at 41 Elm Street in Elizabeth, New Jersey. (Tr. 34:17-19.) Luna and Romero were known associates of Espinosa who, prior to his escape, had either telephone or in-person contact with him. (Tr. 19:8-11.) Luna and Romero had outstanding arrest warrants, plus criminal histories comprised of drug dealing, firearm possession, and suspected gang membership. (Tr. 19:9-15, 201-4.) With respect to the outstanding arrest warrants, Romero's was issued due to failure to

1

appear on a traffic summons, (Def. Ex. B), while Luna's was issued due to failure to appear on a criminal complaint charging him with possession of marijuana. (Def. Ex. C.) Because of their prior contact and association with Espinosa, the Task Force had reason to believe that Espinosa was with Luna and Romero at 41 Elm Street. (Tr. 20:16-18.) Accordingly, officers prepared to execute the arrest warrants on Luna and Romero that evening. (Tr. 21:11-17.) A team of ten to fifteen men was assembled and equipped with firearms, handcuffs, and bulletproof vests. (Id.)

When the officers arrived at 41 Elm Street, they found a multi-unit apartment complex with a locked front entrance. (Tr. 36.) A sign posted at the front entrance read in English and Spanish, "No visitors are permited [sic] in this building, unless accompanied by a resident anyone not acvcompanied [sic] by a resident will be prosecuted as a trespaser [sic]." (Def. Ex. 1.) The front entrance was locked, so Inspector Marshal Daniel R. Potucek climbed through a partially opened window located in a stairwell. (Tr. 70:2-4.) Once inside, Inspector Potucek opened the front door of the building and let in the remaining officers. (Tr. 70:3-7.) They positioned themselves in the first-floor hallway. (Tr. 21:22-25, 22:1-5.)

Soon afterwards, at approximately 2:00 a.m., the officers heard male voices emanating from the basement. (Tr. 22:9-25, 23:1., 55:23-24.) As the voices grew louder, the officers discovered three men making their way up the stairwell. (Tr. 23:11-17, 24:4-10.) It was at that point when the Task Force officers encountered Luis Luna, James Romero, and a third person–Defendant Frankie Correa. (Tr. 24:4-10.) The officers identified themselves to the men. (Tr. 23:17-18.) Luna and Romero were recognized immediately, as the officers had reviewed photographs of the men prior to

their dispatch. (Tr. 25:8-18.) Consequently, Luna and Romero were quickly secured on the first-floor. (Tr. 24:14-16.) Defendant was also secured. (Tr. 71:1-3.) After struggling a bit, Inspector Potucek positioned Defendant face-down on the stairs leading up to the first floor. (Tr. 71:5-14.) At that point, Defendant blurted out– "I have a gun!". (Tr. 26:10-21, 71:16.) Inspector Potucek then retrieved a loaded firearm from Defendant's front pocket. (Tr. 71:25, 72:1.) According to Romero, he and Luna were visiting Defendant on the evening in question. (Tr. 91:9-21.) Defendant was staying with his mother–Jeanette Rodriguez–who was a tenant in the multi-unit apartment building. (Tr. 113-11-17.)

Defendant Frankie Correa was thereafter indicted by a federal grand jury and charged with unlawful possession of a firearm in violation of 18 U.S.C. § 922(g) on March 27, 2008. (Dock. Entry 1.) Upon entering a plea of not guilty, Defendant moved to suppress the firearm as fruit of an illegal seizure. (Dock. Entry 11.) The Court held an evidentiary hearing on the instant motion on October 15, 2008. (Dock. Entry 18.) Both Defendant and the Government have since filed their written submissions. (Dock. Entry 20, 22, 23.) An appropriate discussion of law follows.

## II. Standard

The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. The "capacity to claim the protection of the Fourth Amendment depends . . . upon whether the person who claims the protection of the Amendment has

a legitimate expectation of privacy in the invaded place." See Minnesota v. Olson, 495 U.S. 91, 95 (1990) (quoting Rakas v. Illinois, 439 U.S. 128, 143 (1978)).  An expectation of privacy is deemed legitimate if the person challenging the search can show that he or she has "both a subjective expectation of privacy and that the expectation is objectively reasonable, that is, one that society is willing to accept."  Warner v. McCunney, 259 Fed. Appx. 476, 477 (3d Cir. Jan. 8, 2008) (citing Olson, 495 U.S. at 96-97); see also Katz v. United States, 389 U.S. 347, 361 (1967) (Harlan, J., concurring).

### III. Discussion

Defendant Frankie Correa moves to suppress the firearm as fruit of an unlawful seizure.  According to Defendant's Memorandum of Law, the firearm "must be suppressed because the fugitive task force officers violated Mr. Correa's Fourth Amendment rights when they surreptitiously entered his locked apartment building without authority or invitation." (Def. Mem. of Law 4.)  Defendant contends that the Fourth Amendment does not "permit law enforcement authorities to enter a third person's home to serve an arrest warrant on a non-resident suspect, absent exigent circumstances."  (Id. at 5 (citing Steagald v. United States, 451 U.S. 204, 213-14 (1981).)  Here, Defendant contends, no exigent circumstances existed to justify the entry.  (Def. Mem. of Law 5.)  Secondly, Defendant contends that he had a legitimate "expectation of privacy in the hallways and stairwells of his locked apartment building."  (Id. at 6.)

The Government does not address Defendant's reliance on Steagald.  Instead, it contends that the cases cited by Defendant only concerned entrance into a residence or home; whereas here, entrance into a stairwell or common area is at issue, the Government contends that the situations are inapt.  (Gov't Opp'n Mem. 15.)  Even if the

Court were to find that the hallway or common areas constitute a residence subject to a legitimate expectation of privacy, the Government contends that exigent circumstances warranted the entry into the apartment building.  (Id. at 16.)  The Government bases this exigency on threats to law enforcement and the general public, as evidenced by the totality of the circumstances.  (Id.)  Aside from these contentions, the Government primarily contends that Defendant has no legitimate expectation of privacy in the common areas of the apartment building.  (Id. at 7.)  Because it is a threshold issue, this latter contention serves as the focus for the Court's Fourth Amendment inquiry.

There is no reasonable expectation of privacy in the common areas of a multi-unit apartment building.  See United States v. Acosta, 965 F.2d 1248, 1252 (3d Cir. 1992) (holding that defendants had no reasonable expectation of privacy in the common areas of an apartment building); see also United States v. Dickens, 695 F.2d 765, 778 (3d Cir. 1982), cert. denied, 460 U.S. 1092 (1983) ("Expecting privacy in a building staircase accessible to other tenants and the general public cannot be considered reasonable.")  The Third Circuit recently affirmed this proposition, albeit in a non-precedential opinion.  See United States v. Porter, 281 Fed. Appx. 106, 109 (3d Cir. June 9, 2008) ("[E]ven if [Defendant] was entitled to Fourth Amendment protection in the apartment he was in, those rights were not implicated, because [Defendant] had no expectation of privacy in the hallways and common areas.").  The outcome here is no different.  Defendant Correa lacked a reasonable expectation of privacy when was seized in the stairwell of the apartment building at 41 Elm Street.

Just to elaborate, the Government concedes that Defendant Frankie Correa had an expectation of privacy in his mother's apartment.  (See Gov't Opp'n Mem 11.)  This

expectation applies even if Defendant did not live with his mother; mere overnight guests have an expectation of privacy in a host's home. See Minnesota v. Olson, 495 U.S. 91, 98 (1990) (noting that an overnight guest "seeks shelter in another's home precisely because it provides him with privacy"). Defendant's expectation of privacy in his mother's apartment, however, does not extend beyond the apartment door.

Hallways are "easily accessible to tenants, visitors, solicitors, workmen and other members of the public." Acosta, 965 F.2d at 1252. Accordingly, the majority of Circuits stand with the Third Circuit in finding no reasonable expectation of privacy in the common areas of a multi-unit apartment building. See e.g., United States v. Nohara, 3 F.3d 1239, 1241 (9th Cir. 1993) (finding no reasonable expectation of privacy in the hallways of a high security, high rise apartment complex); United States v. Concepcion, 942 F.2d 1170, 1172 (7th Cir. 1991) (noting that "the area outside one's door lacks anything like the privacy of the area inside", and holding that "a tenant has no reasonable expectation of privacy in the common areas of an apartment building."); United States v. Holland, 755 F.2d 253, 255 (2d Cir. 1985) (holding that "common halls and lobbies of multi-tenant buildings are not within an individual tenant's zone of privacy even though they are guarded by locked doors."); United States v. Eisler, 567 F.2d 814, 816 (8th Cir. 1977) (finding no reasonable expectation of privacy in the hallways of an apartment building notwithstanding locks on the doors to the entryways of the apartment complex); United States v. Cruz Pagan, 537 F.2d 554, 558 (1st Cir. 1976) (finding no reasonable expectation of privacy in well traveled common areas of a condominium or apartment complex); but see United States v. Carriger, 541 F.2d 545 (6th Cir. 1976) (finding reasonable expectation of privacy in common areas of apartment

6

building where entryway into apartment building was locked); see also United States v. Heath, 259 F.3d 522, 533-34 (6th Cir. 2001) (same).

Contrary to Defendant's contention, the presence of a locked entryway and a sign on the door stating 'no visitors unless accompanied by a resident' does not demand a different result. To be sure, the Third Circuit has not confronted the precise issue before the Court–whether persons in common areas of an apartment building with a locked entryway and a 'no visitor' sign have a reasonable expectation of privacy. See Acosta, 965 F.2d at 1252 ("It is undisputed that one of the officers turned the doorknob and found that the door was unlocked."). Nevertheless, the persuasive precedent of the Ninth, Eighth, and Second Circuits, see supra, informs this Court's judgment today. In Eisler, the Eighth Circuit observed,

> The locks on the doors to the entrances of the apartment complex were to provide security to the occupants, not privacy in common hallways . . . An expectation of privacy necessarily implies an expectation that one will be free of any intrusion, not merely unwarranted intrusions.

567 F.2d at 816 (internal citations omitted). This reasoning is persuasive. Additionally, the context of the Ninth Circuit decision lends further weight to the Court's holding. In Nohara, the Court found there was no reasonable expectation of privacy in the common areas of an apartment building, even though the specific apartment building was described as follows:

> The Craigside is a high security, high rise apartment building. It has twenty-seven stories with seven apartments per floor. There are twenty-four hour security guards on duty. Residents can monitor the entrances to the building and garage on their television sets. The elevator conveys evening guests directly and solely to their hosts' floors.

Nohara, 3 F.3d at 1240. The extensive measures in Nohara, like the less-extensive

7

measures in the instant case, serve to provide security to the tenants and their overnight guests. But they do not create a zone of privacy outside the apartment units inside the building. The majority approach of the First, Second, Third, Seventh, Eighth, and Ninth Circuit Courts of Appeal fortifies this security by giving "tenants the benefit of much-needed police protection in common hallways." Holland, 755 F.2d at 256.

Nevertheless, Defendant seeks refuge in Third Circuit dicta. He contends that "the fugitive task force officers needed to resort to both *guile and force* in order to gain access to the building..." (Def. Mem. of Law 8) (emphasis added). As noted above, see Part I, supra, Officer Potucek entered the building through a partially opened window before letting in the other officers through the front door. Relying on Acosta, Defendant suggests this entry somehow taints his seizure. See 965 F.2d 12452 (noting that "the officers did not resort to trickery, guile or force in order to enter the building."). The Court disagrees with Defendant's analysis of Acosta, as well as the characterization of the instant entry.

First and foremost, unlike the situation in Acosta, two arrest warrants were issued in this case. Armed with arrest warrants for Luna and Romero plus a reasonable belief that both men were located at 41 Elm Street with Union County Jail escapee Espinosa, the officers entered the apartment building with the limited intention of executing the arrest warrants. Not once did the officers enter a residence or apartment unit.[1] On the facts, therefore, Acosta is on a different footing than the present case.

---

[1] In this respect, the instant case is easily distinguishable from McDonald v. United States. See generally 335 U.S. 451 (1948). There, an officer climbed through a window into the landlady's room of a rooming house. Id. at 452-53. After gaining entry, the officer identified himself to the landlady and let in the remaining officers. Id. at 453. They subsequently demanded entry into a room they suspected was being used for an illegal numbers

Secondly, the Third Circuit's acknowledgment of "trickery, guile or force" in this context was by no means central to its holding that the "defendants had no reasonable expectation of privacy in the common area". Acosta, supra, at 1253. After carefully analyzing the Second Circuit's decision in United States v. Holland, the Court agreed with the analysis and ruled accordingly. Acosta, supra, at 1251-52. The Third Circuit then noted, "*[i]n addition*, the officers did not resort to trickery, guile, or force in order to enter..." Id. at 1252 (emphasis added). Even if this observation was integral to the Third Circuit's holding, which it was not, it must be squared with the facts of that case. There, the officers opened an unlocked outer door to gain entry into the hallway of the apartment building. Id. at 1250. Here, an officer opened a partially opened window in a stairwell to gain entry. The Court notes that entrance through a window is not common. But given the record before the Court, no more *force* was applied in opening the window than was applied in opening the door in Acosta.

Lastly, given that a person has no reasonable expectation of privacy in the common area of an apartment building, the Court fails to see how the manner of entry

---

game. Id. At no time did the officers have a warrant. Id. at 454. After the occupant opened the door, they discovered adding machines, papers, and money. Id. at 453. The Supreme Court suppressed the evidence. Id. at 456. In a concurring opinion, Justice Jackson opined:

> [T]he officer in charge of the investigation took the matter into his own hands. He neither had, nor sought a search warrant or warrant of arrest; he did not then have knowledge of a crime sufficient, in his own opinion, to justify arrest, and he did not even know that the suspect . . . was in the rooming house at the time. Nevertheless, he forced open the window of the landlady's bedroom and climbed in.

McDonald, 335 U.S. at 457 (Jackson, J., concurring). Here, as noted above, two arrest warrants were secured prior to entry, and at no time did the Task Force officers enter a residence or apartment unit in the building. The Court notes the entry into the Rodriguez apartment occurred *after* the seizure of Defendant. As a result, that entry is irrelevant to the scope of the instant Fourth Amendment inquiry.

9

into that area somehow taints the legality of a seizure therein, as Defendant suggests. (Def. Mem. of Law 8.)  For example, even though the Sixth Circuit finds an expectation of privacy in the common areas of a locked apartment building, it nonetheless notes that "[i]t is the *authority* to enter, not the manner of entry, that provides the legality for the officers' conduct". Heath, 259 F.3d at 534.  The First Circuit, embracing the majority view, agrees–"Whether or not the agents' entry was a technical trespass is not the relevant inquiry." Cruz Pagan, 537 F.2d at 558.  Thus, Defendant is misguided when he attempts to transform an observation of the facts in that case into a test of reasonableness in the present one.[2]  Particularly whereas here, two fugitive arrest warrants were issued, the officers had the limited authority to execute the arrests of Luna and Romero.

Defendant Correa does not challenge, and the parties have not briefed, the issue of whether the officers had reasonable suspicion to stop him in the hallway when they encountered the subjects of the arrest warrant.  Additionally, Defendant does not challenge, and the parties have not briefed, the issue of whether the statement by Defendant–"I have a gun"–constitutes a voluntary admission under Miranda.  See e.g., United States v. Brown, 261 Fed. Appx. 371, 374 (3d Cir. Jan. 24, 2008) (citing Alston v. Redman, 34 F.3d 1237, 1246-47 (3d Cir. 1994)).  Accordingly, this Court need not reach these issue today.  It is sufficient to say that Defendant had no expectation of privacy in

---

[2]  An comparison is helpful.  There is no reasonable expectation of privacy in open fields.  See Hester v. United States, 265 U.S. 57 (1924), aff'd, Oliver v. United States, 466 U.S. 170, 180 (1984) (applying Katz v. United States, 389 U.S. 347 (1967), and finding no reasonable expectation of privacy in an open field).  As such, no Fourth Amendment violation results when law enforcement officers trespass onto a private open field that is posted and encircled by a fence.  Id. at 182-184.  While not a perfect analogy, the logic of the Supreme Court's reasoning in Oliver comports with the Sixth and First Circuits views in Heath and Cruz Pagan, respectively.

the common areas of the apartment building when he was seized by the Task Force.

## IV. Conclusion

For the foregoing reasons, Defendant Frankie Correa's Motion to Suppress Evidence [Dock. Entry 11 & 20] is denied.  Defendant lacked a reasonable expectation of privacy in the common areas of the apartment building under the Fourth Amendment.  Moreover, in perfecting the seizure of Defendant, the officers did not enter a residence or apartment unit.  Because the Court decides the matter on this ground, there is no need to examine whether the officers could lawfully enter the building to execute the arrest warrants on Luna and Romero under Payton v. New York.  See United States v. Veal, 453 F.3d 164, 167 (3d Cir. 2006) ("Payton requires that officers have 'a reasonable belief the arrestee (1) lived in the residence, and (2) is within the residence at the time of entry.' ") (quoting United States v. Gay, 240 F.3d 1222, 1226 (10th Cir. 2001)) (emphasis added).  Nor must the Court perform an analysis under Steagald v. United States.  See 451 U.S. 204, 213-214 (1981) (holding that an arrest warrant–without a search warrant–does not permit law enforcement authorities to enter a third party's *home* to legally search for the subject of the arrest warrant) (emphasis added).  In sum, Defendant's motion is denied.  An appropriate Order follows.

## *ORDER*

**AND NOW**, this 9th day of April, 2009, upon due consideration of Defendant Frankie Correa's Motion to Suppress Evidence [Dock. Entry 11 & 20] and the Government's Memorandum in Opposition to Defendant's Motion to Suppress [Dock. Entry 22] and Defendant's Letter in Reply [Dock. Entry 23], and having held an Evidentiary Hearing on October 15, 2008, for the reasons set forth in the above Memorandum, it is hereby **ORDERED** that Defendant Frankie Correa's Motion to Suppress Evidence is **DENIED**.

/S/ Joseph H. Rodriguez
U.S.D.J.
